MATTHEW M. GRAVES
United States Attorney
District of Columbia

Troy A. Edwards, Jr.
Assistant United States Attorney
N.Y. Bar No. 5453741
Ahmed M. Baset
Jeffrey S. Nestler
Kathryn Rakoczy
Assistant United States Attorneys
Louis Manzo
Special Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

Alexandra Hughes
Justin Sher
Trial Attorneys
National Security Division
United States Department of Justice
950 Pennsylvania Avenue
NW Washington, D.C. 20004
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Edwards Vallejo,<br><br>Defendant. | No. 2:22-mj-05032-DMF<br><br>**Government's Memorandum<br>in Support of Motion for Detention** |

Edward Vallejo is charged by indictment with seditious conspiracy and related offenses for participating in a plot to oppose by force the execution of the laws governing the transfer of presidential power following the 2020 United States Presidential Election, including an attack on the United States Capitol on January 6, 2021. He should be detained pending trial.

Vallejo played a central role in the planned use of force in this plot, agreeing and preparing to usher firearms and other related equipment into Washington, D.C., to his co-

conspirators.   After January 6, Vallejo continued to look for ways to support the co-conspirators' mission.   He also acknowledged commands by the leader of the conspiracy to watch out for "turn-coat snitches" amongst the co-conspirators' ranks.   Based on the compelling evidence of Vallejo's role in the charged offenses, there are no conditions of release that can reasonably assure the safety of the community or the defendant's appearance in court.   Vallejo also poses a risk obstruction of justice should he be released.   Pretrial detention is warranted and necessary.

## I.      Procedural Background

Vallejo is charged with seditious conspiracy, in violation of 18 U.S.C. § 2384; conspiracy to obstruct Congress, in violation of 18 U.S.C. § 1512(k); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); and conspiracy to prevent an officer from discharging any duties, in violation of 18 U.S.C. § 372.   Upon return of the indictment, a United States Magistrate Judge for the District of Columbia issued a warrant for Vallejo's arrest.   Vallejo was arrested on January 13, 2022, and he had his initial appearance before this Court on Friday, January 14.   The United States has moved for Vallejo's pretrial detention pursuant to 18 U.S.C. §§ 3142(f)(1)(E) (case that involves a felony "that involves the possession or use of a firearm, destructive device … or any other dangerous weapon"), 3142(f)(2)(A) (case that involves "a serious risk that [the defendant] will flee"), and 3142(f)(2)(B) (case that involves "a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror").   The detention hearing is scheduled for January 20.

## II.      Factual Background

Vallejo participated in a plot to oppose by force the execution of the laws governing the transfer of presidential power in the United States.   In November 2020, days after the Presidential Election, co-defendant Elmer Stewart Rhodes III, the leader of the conspiracy, began recruiting co-conspirators to join him in traveling to Washington, D.C., for operations aimed at stopping the transfer of power with the support of an armed "quick

reaction force," or "QRF," stationed just across the river in Arlington, Virginia.  Vallejo and others joined and implemented this plan by, among other means, using social media and encrypted messaging to communicate; amassing weaponry and tactical gear; organizing into regional teams to transport these items to the D.C. area; and staging Vallejo nearby to be prepared to assist his co-conspirators at his commander's orders.

In December 2020, after the Electoral College cast ballots confirming Joseph Biden as the President-Elect, the defendants' criminal plan focused on delaying or stopping Congress's Certification of the Electoral College vote ("Certification proceeding").  This plan materialized on January 6, 2021, the day of the Certification proceeding, when two military-style stacks of co-conspirators, along with other rioters, forcibly breached the Capitol with Vallejo and others staged as armed QRF teams across the Potomac River, awaiting deployment—a deployment which proved unnecessary, because the co-conspirators were able to breach the Capitol with the forces they had on the Capitol grounds.  The breach succeeded in delaying the Certification proceeding for several hours, and the proceeding ultimately concluded in the early morning hours of January 7.  That same morning, Vallejo performed "Recon" in the area near the Capitol to see if he and his co-conspirators' could "probe their defense line."  In the days that followed, Vallejo's team reached out to Rhodes for next steps while his co-conspirators continued to make plans to stop the presidential power transfer, amass additional weaponry and tactical gear, and prepare themselves to deploy their arms, if necessary, to stop the inauguration of a new president.

Vallejo played a central role in the plot to oppose by force American laws governing the transfer of presidential power.  He volunteered to travel across the country to support this plot; stationed himself in a hotel full of firearms, ammunition, and equipment; affirmed his commitment to the mission during the Capitol attack; and expressed support for the plot in the immediate aftermath of the attack.  Vallejo, in his own words and actions, was prepared to use force against the government of the United States of America and there is nothing to suggest that he has changed his views.

**A. Co-Conspirators Plan to Forcibly Oppose the Lawful Transfer of Presidential Power**

In November 2020, days after the election, Rhodes, the leader of the Oath Keepers, began disseminating messages to other Oath Keepers members and affiliates delegitimizing the results of the election and encouraging them to forcibly oppose the lawful transfer of presidential power.  *See* Indictment at ¶ 18(a) (telling those on the "Leadership intel sharing secured" chat (hereafter "Leadership Intel Chat"), on November 5, that they "MUST refuse to accept Biden as a legitimate winner" and warning, "We aren't getting through this without a civil war.  Too late for that.  Prepare your mind, body, spirit.").  Rhodes circulated and highlighted an eight-step plan, allegedly from a Serbian contact to overthrow the government, which included: (i) peaceful protest, (ii) complete civil disobedience, (iii) connecting with the police and organizing neighborhoods, (iv) swarming the streets and confronting opponents, (v) gathering in the capitol and discarding barricades, (vi) police joining with the protestors after initial violence, (vii) storming parliament, and (viii) destroying the state media.  *Id*.

Rhodes followed this plan in the months after the presidential election.  At his direction, certain members of his organization began preparing for operations inside of Washington, D.C.  Indictment at ¶ 21.  He further organized deadly weapons to aid in the conspiracy.  Heavily armed QRF teams would be minutes away, just outside the Capitol, ready to support those on the ground.  *Id*. at ¶¶ 42-45.  All contingency plans were considered.  The conspirators even sought to ferry lethal weapons from Virginia by boat into the Capitol, if the bridges were closed.  *Id*. at ¶ 52

In December 2020, Rhodes focused his co-conspirators on the Certification proceeding of January 6, 2021.  During a December 22 interview with a regional Oath Keepers leader, Rhodes described January 6 as "a hard constitutional deadline" for stopping the transfer of presidential power and warned that if President-Elect Biden were to assume the presidency, "We will have to do a bloody, massively bloody revolution against them."  Indictment at ¶ 30.  On December 23, Rhodes published an open letter on

- 4 -

the Oath Keepers website in which he noted that, on January 6, "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C." *Id*. at ¶ 31. Rhodes warned in the open letter that he and others may have to "take to arms in defense of our God given liberty." *Id.*

Rhodes and his co-conspirators created and administered Signal chats with titles like "DC OP: Jan 6 21" and "OKFL Hangout" for coordinating their plans for January 6. Indictment at ¶¶ 38-40. They utilized encrypted messaging applications for these planning chats and stressed the need for operational security. *See, e.g.*, *id.* at ¶ 27. The co-conspirators discussed being prepared to use violence to stop the "usurpers" from taking control and what weapons they would bring and plans for the QRF. *Id.* at ¶ 41-56, 58-60. On December 25, Rhodes wrote to the OKFL Hangout Chat, "I think Congress will screw him [President Trump] over. The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing. But I don't think they will listen." *Id*. at ¶ 34. Rhodes went on to say, "And he [President Trump] needs to know that if he fails to act, then we will. He needs to understand that we will have no choice." On December 31, one week before the Capitol attack, Rhodes wrote to the Leadership Intel Chat, "There is no standard political or legal way out of this."

**B.   Vallejo and His Co-Conspirators Prepared an Armed QRF To Support the Plot to Stop the Transfer of Power**

Vallejo and his co-conspirators coordinated at least three regional QRF teams stationed at a Comfort Inn in Arlington, Virginia, to support the co-conspirators' plot and the January 6 Capitol attack. Indictment at ¶¶ 45-49. The QRF teams guarded an arsenal of firearms and related equipment and were prepared to speed those weapons into the hands of co-conspirators on the ground in Washington, D.C., when directed by Rhodes or other conspiracy leaders. *Id.* Vallejo served on one of those QRF teams.

On December 31, 2020, Vallejo's Arizona QRF team member messaged Rhodes on Signal that Vallejo and others were coming to Washington, D.C., and that "everyone has

their own technical equipment and knows how to use it," adding a "winky face" emoji. Indictment at ¶ 44. Rhodes responded, "awesome!" *Id.* The Arizona QRF team member also said that Vallejo and the group would have "rifles" and "man power." *Id.*

On January 3, 2021, Rhodes informed a co-conspirator on Signal, "We WILL have a QRF. this situation calls for it." Indictment at ¶ 50. In the following days, co-conspirators communicated and implemented plans to bring weapons to the Comfort Inn. *Id.* at ¶¶ 58-59, 63-65, 68-69. Vallejo messaged co-conspirator and Florida team lead Kelly Meggs, "Sir, Ed Vallejo of Arizona in Tenn. With cadre requesting coordinates to Allied encampment outside DC boundaries to rendezvous. Please respond ASAP. For the Republic." On January 5, Vallejo messaged Meggs again, "Please text location so we will know where to begin in the morning." Meggs responded with the address of the Comfort Inn Ballston, where the co-conspirators staged their multiple QRF teams.

The day before the attack on the Capitol, on January 5, Meggs and his Florida team dropped off at least three luggage carts' worth of gun boxes, rifle cases, and suitcases filled with ammunition with their QRF team. A second QRF team from North Carolina consisted of four men who kept their rifles ready to go in a vehicle parked in the hotel lot. Later, Vallejo and other members of the Arizona QRF team wheeled in bags and large bins of weapons, ammunition, and essential supplies to last 30 days—as seen in the QRF hotel surveillance stills below, showing Vallejo on the left and his Arizona QRF team member on the right:




Throughout, Vallejo and other QRF team leaders updated Rhodes on the extent of their weapons stock and apprised him of their readiness to support the operation on January 6.

**C. Co-Conspirators Attack the Capitol with Vallejo and Others Staged Nearby with Firearms as Part of their Plot to Stop the Lawful Transfer of Power**

At around 6:30 a.m., on January 6, the day of the attack, Rhodes messaged his co-conspirators before departing from his hotel for Washington, "We will have several well equipped QRFs outside DC.  And there are many, many others, from other groups, who will be watching and waiting on the outside in case of worst case scenarios."  Indictment at ¶ 70.

Around that same time, Vallejo and another member of his Arizona QRF team spoke on a podcast about their intentions that day.  Vallejo's Arizona QRF team member stated that he and Vallejo arrived in Washington around noon the prior day, "hooked up with the Oath Keepers and we've bivouacked with them in Arlington."  When asked why they were there, Vallejo's Arizona QRF team member explained that he and Vallejo "have a little bit of inside information with the powers that would oppose the powers that be."  He continued, "The idea is we're here.  We are applying as much pressure as we can.  The only and obvious next step is to go into armed conflict but hoping very much that that doesn't happen."  When the host asked if that was a credible threat, Vallejo's Arizona QRF team member explained, "Anything is on the table … the fact is there are people who are prepared, have the will, have the facilities to do more than taunt.  The question is: Is there a shot heard round the world moment?  The possibility definitely exists."

Vallejo elaborated: "The situation we've got here is … it's a do or die situation. Because if we walk away from this, and we don't have any effectual change as a result, then we might as well just give up.  We're done.  We're done.  If we don't do something now, we're done.  Because we'll basically have illustrated that we'll do nothing in a tinder box situation, and that's it."  Vallejo added, "The American people are going to be told today that we have liberty and justice for all, or they're going to be told, 'Fuck you.'  Okay? And if they're told, 'Fuck you,' that's going to be the declaration of a guerilla war."  Vallejo

continued, "I'm just praying to God that Trump has his head on fucking straight, he has got the machinations behind him, he's got all the proof in the world, and he's going to bring the fucking hammer down!  That's the only hope, the only chance.  If that doesn't happen, then this shit is on."

When the interviewer commented on what he perceived as a broken election system, Vallejo announced his intention to use violence to fix it:

> No that's fine … Because I'm the motherfucker that's gonna fix it for them
> if they tell me today it's broken … You know what I've been telling people?
> I've been telling people for years I'm the guy that everybody said, 'no Ed,
> you can't shoot them yet, it's too soon.  No Ed, you can't shoot the bastards
> yet, it's too soon.'  Well I've been telling them for about five, six months
> ago.  They quit telling me."

Later, Vallejo received word from Rhodes that the Electoral College Certification was going to proceed as required by law, which, in Vallejo's previous own words, was a declaration of "guerilla war."  As a large crowd gathered on the Capitol grounds and converged on the building, Rhodes messaged Vallejo and others on the "DC OP: Jan 6 21" Signal chat: "Pence is doing nothing.  As I predicted …  All I see Trump doing is complaining.  I see no intent by him to do anything.  So the patriots are taking it into their own hands.  They've had enough."  Indictment at ¶ 77.  Around 2:30 p.m., Rhodes explicitly directed his co-conspirators to go to the Capitol.  *Id.* at ¶¶ 88-89.  Moments later, Stack One marched up the east steps of the Capitol, joined the mob that was trying to force the doors open, and breached the building.  *Id.* at ¶¶ 93-95, 97-99.  At that moment, Vallejo stood ready to arm his co-conspirators.  At 2:24 p.m., Vallejo messaged the "DC OP: Jan 6 21" Signal chat, "Vallejo back at hotel and outfitted.  Have 2 trucks available.  Let me know how I can assist."  *Id.* at ¶¶ 86.  Eager to bring weapons into Washington, D.C., Vallejo messaged again at 2:38 p.m., "QRF standing by at hotel.  Just say the word…"  *Id.* at ¶ 96.

Inside the Capitol, half of Stack One tried to force past riot police to the Senate Chamber, but were rebuffed, and the other half went in search of Speaker of the House Nancy Pelosi, but did not find her.  Indictment at ¶¶ 100-106.  Meanwhile, Stack Two, arrived at the Capitol grounds shortly after 2:30 p.m.  *Id.* at ¶ 111.  Stack Two then penetrated the Capitol grounds, marched to the east side doors through which Stack One had entered, and breached the Capitol at approximately 3:15 p.m.  *Id.* at ¶¶ 113-118. Members of Stack Two tried to force their way into the Rotunda but were expelled by law enforcement officers who had begun clearing the building.  *Id.* at ¶¶ 119-121.  By 3:57 p.m., Vallejo declared "We are at WAR."  He then attempted, but failed, to launch what he had earlier described in the "DC OP: Jan 6 21" Signal chat as a "drone with a 720p cam for recon use."  After they exited the Capitol, members of both Stack One and Stack Two met up with Rhodes and other Oath Keepers members and affiliates just outside the Capitol. *Id.* at ¶ 124.

Because of the breach of the Capitol, members of the House and Senate were evacuated from their respective chambers at approximately 2:20 p.m.  The Joint Session and the entire official proceeding of the Congress was halted while Capitol Police and other law-enforcement officers worked to restore order and clear the Capitol of the unlawful occupants—including Vallejo's co-conspirators.  The Joint Session was not able to reconvene until approximately 8:00 p.m.  In the course of the attack, over 100 members of law enforcement were assaulted, and one Capitol Police officer died shortly after being hospitalized in connection with injuries sustained in the attack.  Additionally, four citizens died; many media members were assaulted and had cameras and other news-gathering equipment destroyed; and the Capitol suffered millions of dollars in damage—including broken windows and doors, graffiti, and residue of various pepper sprays, tear gas, and fire extinguishers deployed both by crowd members who stormed the Capitol and by law enforcement officers trying to restore order.

**D. After January 6, Vallejo and his Co-Conspirators Continued Efforts to Forcibly Oppose the Lawful Transfer of Presidential Power**

While law enforcement was still securing the perimeter of the Capitol grounds and building, Vallejo and his co-conspirators plotted next steps to ensure they stopped the transfer of presidential power. At around 4:45 p.m., another individual messaged the "DC OP: Jan 6 21" Signal chat, "so why are we leaving??? It does NO good to go show up and say your there to defend and then just leave." Vallejo responded, "Leaving?!? I ain't goin nowhere … My statement was to assure you Arizona won't let anyone walk." Displaying a disregard for legal orders, Vallejo added, "we will monitor all night and transport anyone that meets us on the perimeter curfew be damned."

Later that evening, at around 7:30 p.m., Rhodes messaged the "DC OP: Jan 6 21" Signal chat, "Thousands of ticked off patriots spontaneously marched on the Capitol … You ain't seen nothing yet," and, "Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming." Indictment at ¶ 126(a). Vallejo pledged, "We'll be back to 6am to *do it again*. We got food for 30 days." *Id.* at ¶ 126(b) (emphasis added). He added, "We have only [begun] to fight! … 'After Action Reports' will be dated 1/21/21," referring to the day after the Inauguration—identified in the 20th Amendment to the Constitution as the day the President's term ends. *Id.* Although law enforcement at the Capitol had successfully repelled the efforts of the conspiracy to take the Capitol on January 6, Vallejo's words make clear that the conspiracy would continue up and through the Presidential Inauguration. Undeterred by the unprecedented violence at the Capitol, Vallejo planned for next steps.

On January 7, at 5:46 a.m.—mere hours after Congress completed the Electoral College Certification vote and the Capitol had been attacked—Vallejo messaged the "DC OP: Jan 6 21" Signal chat, "We are going to probe their defense line right now 6 am they should let us in. We'll see." Indictment at ¶ 127. At 5:54 a.m., he stated, "Departing for Recon now. Stewart [Rhodes] call me when you're up." *Id.* About ten minutes later, Vallejo continued, "I'll depart when cleared by my Commander Sir." *Id.* Vallejo then

messaged Rhodes personally on Signal, "Status report posted in Ops[,] room extended 1 day[.]  Standing by awaiting orders, Sir."

Later that morning, Vallejo and his Arizona QRF team member reappeared on the same podcast they spoke on the previous day.  Vallejo explained that he and others "got up before dawn, and we went to the Capitol … we did what we needed to do, did our check in, and then we got back here to take care of business."  Vallejo's Arizona QRF team member added, "We are here, prepared in all aspects, to support the Constitution and honor our Oaths that we took … It's not really plausible to non-violently protest anymore, because the entire area is closed, and cordoned, and curfewed.  So the question becomes, when we realize that this wrong has been done, what are the next steps?  I mean is this the shot heard 'round the world moment?"  When asked on the podcast if he was returning to Arizona, Vallejo remained ready to act explaining, "I don't know.  We've got to figure out what happens on the 20th."  Ultimately, Vallejo noted, "I'm never done … I'm waiting for orders from Stewart Rhodes."

Rhodes and the other co-conspirators were not done either.  Rhodes purchased thousands of dollars' worth of firearms, ammunition, and equipment and summoned co-conspirators like Joshua James to his side in Texas.  Indictment at ¶¶ 129-130.  James collected what he referred to as "all available firearms," and traveled to Texas where he stayed with Rhodes and others.  *Id.*  On January 10, James sent Meggs a message asking if Meggs and other Florida Oath Keepers were coming to Texas to join him and Rhodes, and Meggs responded, "Fl stays home until shots fired !"  *Id.* at ¶ 131.

Vallejo, however, *did* try to join Rhodes in Texas.  On January 11, Rhodes messaged Vallejo on Signal, "Ed, what's your 20?  You in TX?"  Vallejo responded that he had been delayed, and Rhodes noted that he was "up in Ft Worth area."  Vallejo replied, "C U there[.]  Godspeed Sir."  On January 12, Vallejo messaged Rhodes, "We have arrived at the Courthouse."  Vallejo's Arizona QRF team member messaged Rhodes, "Hi Stewart.  I'm sure you're busy[] but wanted to let you know that [Vallejo] and I are here … We are excited to learn next steps and would like to know what we should be doing right now."

- 11 -

*Id.* at ¶ 132.  On January 20, Inauguration Day, James messaged another individual, "After this…if nothing happens…its war…Civil War 2.0." *Id.* at ¶ 133.  Around this time, Rhodes messaged others to organize local militias to prepare to forcibly oppose the new administration. *Id.* at ¶ 134.

### E.  Co-Conspirators Conceal Evidence of the Conspiracy

Many of Vallejo's co-conspirators also took steps to destroy evidence of their involvement in this conspiracy and discussed securing their communications.  In the weeks after January 6, an associate of Rhodes's encouraged various co-conspirators to delete incriminating messages from their phones.  The investigation has revealed that numerous co-conspirators deleted evidence from their phones in the weeks after January 6.  Rhodes— Vallejo's perceived commander, from whom he took orders throughout the conspiracy— also messaged with Vallejo about securing his communications from the government.  On January 24, less than a week after the first co-conspirators were arrested, Rhodes messaged Vallejo on Signal, "Ed, keep in mind that is NOT a secure chat.  Contains at least one turn-coat snitch.  Keep that in mind.  Please confirm you got this."  Vallejo responded that he had received Rhodes's message, expressed that he was innocent, and reminded Rhodes, "[i]f you ever need me for ANYTHING I am on call and am at your service, Sir!"

### F.  Vallejo's Continued Threat

One year later, Vallejo continues to believe his and others' actions at the Capitol on January 6 were not unlawful or dangerous.  On December 30, 2021, Vallejo retweeted a message stating in part, "There was NO INSURRECTION on J6 just a peaceful protest."[1] And, as recently as January 8, 2022, Vallejo continued to sanitize the Capitol attack and specifically focus on the 2020 Presidential Election, retweeting, "The real insurrection happened in the wee hours of Nov. 4, 2020."[2]  Further, Vallejo continues to endorse violence against authorities when he disagrees with actions those authorities take.  In

---

[1] *See* https://twitter.com/Starryder10/status/1476647037491769344.

[2] *See* https://twitter.com/beachlvr21399/status/1479832036160548866.

December 2021, commenting on vaccine efforts related to the ongoing pandemic, Vallejo threatened: "I HAVE NEWS FOR YOU … you will NEVER achieve 'vaccine equality' as long as I, and others like me, are alive! … I will DIE first, and that's only when I run out of AMMUNITION!"[3]

## III.  Argument

Pursuant to 18 U.S.C. § 3142(a), when a defendant is arrested, the Court, in relevant part, "shall issue an order that, pending trial, the person be (1) released on personal recognizance . . .; (2) released on a condition or a combination of conditions . . .; or (4) detained under subsection (e)."  Detaining a defendant under Section 3142(e) requires a hearing "pursuant to the provisions of subsection (f)."  *Id.* at § 3142(e).  The evidence outlined above makes plain that Vallejo should be detained pending trial.

### A. Bases for Detention Request

According to Section 3142(f), there are limited circumstances in which the Court "shall hold a hearing to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community."  18 U.S.C. § 3142(f); *see also United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003).  Here, three of those circumstances apply: Subsections (f)(1)(E) (case that involves a felony "that involves the possession or use of a firearm, destructive device … or any other dangerous weapon"), 3142(f)(2)(A) (case that involves "a serious risk that [the defendant] will flee"), and 3142(f)(2)(B) (case that involves "a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror").  All three bases for a detention hearing are supported by the evidence outlined above.

First, this case involves the possession and use of firearms.  Section 3142(f)(1)(E) mandates a detention hearing in connection with "any felony" if the Government proves

---

[3] *See* https://twitter.com/Psychictaxi/status/1476565450150449153.

by a preponderance of the evidence that the charged felony "involves the possession or use of a firearm or destructive device[.]"  In determining whether the charged felony "involves the possession or use of a firearm," the Court "may consider the actual conduct at issue in the specific case," and not just whether the elements of the charged offenses required the possession or use of a firearm.  *United States v. Watkins*, 940 F.3d 152, 166 (2d Cir. 2019).[4]  Here, the conspiracy involved the planning and coordination of QRF teams armed with an arsenal of firearms that Vallejo and others would bring to co-conspirators on the ground at the direction of Rhodes or other leaders of the conspiracy.  Accordingly, this case involves the possession and use of firearms, and Section 3142(f)(1)(E) is an appropriate basis for a detention hearing.

Second, this case also involves a serious risk of flight as defined in 18 U.S.C. § 3142(f)(2)(A).  Vallejo is facing potential conviction on numerous felony offenses that each carry statutory maximum penalties of up to twenty years of incarceration.  He is alleged to have participated in a conspiracy to oppose the lawful transfer of presidential power by force, making it inherently unlikely that he will be willing to comply with conditions of release set by this government.  Additionally, Vallejo resides in a compound-like structure surrounded by barbed-wire fences and demonstrated in January 2021 that he is willing and capable of preparing and storing months' worth of food at a time.  If Vallejo repudiates the Court's authority and his conditions of release the way he forcibly repudiated the laws of the United States, he has the means and capability of bunkering down and refusing to appear for court-ordered hearings.  These factors all combine to give Vallejo the incentive and means to flee and attempt to evade prosecution.

_____

[4] In an analogous context interpreting Section 3142(f)(1)(A), the Fifth Circuit held that "it is not necessary that the *charged offense* be a crime of violence; only that the *case involve* a crime of violence or any one or more of the § 3142(f) factors."  *United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992) (emphasis in original).  In *Byrd*, the court held that the government could have met its burden (but did not) under Section 3142(f) by showing that the nonviolent charged offense— receiving a videotape depicting minors engaged in sexually explicit activity—was accompanied by actual violent criminal activity such as child molestation.

Finally, this case also involves a risk of tampering with witnesses and evidence and obstructing justice.  As described above, Vallejo's co-conspirators went to great efforts to delete key communications regarding this conspiracy and to convince others to do the same—to include Rhodes, for whom Vallejo would do "ANYTHING."  Further, Vallejo is alleged to have participated in arguably the most consequential obstruction effort in the history of the United States.  He is charged in part with plotting to oppose the government's laws by force and with obstructing, influencing, or impeding the congressional proceedings to certify the 2020 United States Presidential Election.  A defendant willing to take these extraordinary steps to obstruct the certification of a presidential election surely poses a serious risk of obstructing justice or intimidating witnesses involved in his own criminal case.

Under any of those three bases—firearms, flight, and obstruction—a detention hearing is warranted.  And together, those three features illustrate the need to detain Vallejo pending trial to protect the community, ensure his return to court, and safeguard the integrity of evidence and the proceedings in this case.

## B. Analysis

The Court must consider four factors to determine whether pretrial detention is warranted and necessary: (1) the nature and circumstances of the offense charged, including whether, for example, the offense is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).  The burden of persuasion rests with the government.  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).  A judicial officer's finding of dangerousness must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f); *Stone*, 608 F.3d at 945.  When "risk of flight" is the basis for detention, however, the government must only satisfy a preponderance of the evidence standard. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996); *United States v. Chimurenga*, 760 F.2d 400, 405-06 (2d Cir. 1985); *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir.

1985); *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985); *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  An analysis of these four factors weighs heavily in favor of Vallejo's detention given the clear and convincing evidence that he presents a particular danger to the community as well as the preponderance of evidence that he poses a serious risk of flight and of obstructing justice.

### 1.  Vallejo's Criminal Activity was Extreme and Serious

A grand jury has found probable cause to charge Vallejo with participating in a conspiracy to forcibly oppose the lawful transfer of presidential power in the United States. It is difficult to imagine conduct that poses a graver risk to our society than one targeted at undermining the laws and procedures at the heart of our democratic process—and doing so with force.  *See United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021) ("[T]o order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community.  The threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'") (quoting *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988)).  As described in greater detail above and in the indictment, Vallejo volunteered to participate; he drove thousands of miles across the country with firearms, ammunition, and equipment; he participated in planning meetings and chats on encrypted messaging applications; he made clear on the morning of January 6 that he was willing and prepared to do more than "taunt" and engage in a "guerilla war"; he prepared to quickly transport firearms and gear to co-conspirators on the ground who were, at that time, attacking the Capitol; and he continued the mission before the dust had even settled by "probing" the Capitol and conducting "Recon" on January 7.  This factor weighs in favor of detention.

## 2.  The Weight of the Evidence Against Vallejo is Strong[5]

Vallejo's dangerousness is chronicled in his written and recorded communications; corroborated by his conduct before, during, and after January 6; buttressed by his obstruction efforts; and reinforced by the indisputable success of his and his co-conspirators' plot where, most alarmingly, dozens of Oath Keepers gathered in the Washington area on January 6 to participate in an attack on the Capitol featuring two military-style stacks and an armed QRF that he participated in, which forced the Certification of a presidential election to be delayed.

Vallejo's actions and words speak for themselves.  His electronic and recorded communications show he was an active participant in the seditious conspiracy, willing and able to penetrate Washington, D.C., with an arsenal of firepower and equipment to arm his fellow co-conspirators to stop the transfer of power.  Casting the struggle for control of the White House in existential terms—repeatedly using terms like "WAR" and "guerilla war" to describe the path forward—Vallejo emphasized that he and his co-conspirators may have no choice but to take up arms to stop the next administration from taking power.  Then he traveled across the country to the Washington, D.C., metropolitan area, with firearms and ammunition and wheeled multiple large bins of equipment into the QRF hotel, ready to take matters into his own hands.  And, on January 6, Vallejo actively sought to join his co-conspirators' attack on the Capitol and did in fact support it: when his co-conspirators breached the Capitol, pivotal moments in the January 6 attack, they did so knowing they had Vallejo and other QRF teams supporting them just across the river with an arsenal.

Vallejo did not stop there.  On the night of the attack, Vallejo was not deterred by the law enforcement presence or violence that marred the day, but rather he told his co-conspirators he was ready "to *do it again*."  Shortly after the Congressional proceedings finally concluded in the early morning hours of January 7, Vallejo was already probing

---

[5] "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948 (citation omitted).

defenses and conducting reconnaissance around the Capitol to report back to Rhodes and his co-conspirators.  Indeed, Vallejo was prepared for a prolonged attack with a months' worth of food and was already targeting the next constitutional benchmark of January 20, Inauguration Day: "We have only [begun] to fight! … After Action Reports' will be dated 1/21/21."  Vallejo was prepared to use force to stop this country's presidential transfer.  There is no reasonable basis to believe this defendant would abide by any conditions of release.

Vallejo displayed a willingness to continue his criminal activity and loyalty to Rhodes after January 6.  Within a week of the attack, Vallejo was already trying to learn next steps and to reconnect with Rhodes in Texas, where Rhodes had begun amassing other co-conspirators and thousands of dollars of firearms and tactical equipment.  Vallejo told his commander and the leader of the co-conspirators' attack on the Capitol that he was on call and at Rhodes's service if he needed "ANYTHING," displaying a continued willingness to engage in dangerous, illegal behavior.  Meanwhile, Rhodes continued to encourage his followers to forcibly oppose the government—on January 28, for example, Rhodes appeared on the "Infowars" program and told listeners they need to treat the Biden Administration as an "occupying enemy force."  Far from disavowing Rhodes or any intentions to forcefully oppose the United States, Vallejo messaged Rhodes as late as March 2021 agreeing to join a new Signal group chat and confirming to Rhodes that he understood the importance of secure communications.

There is overwhelming evidence that Vallejo participated in a plot to oppose by force the execution of the laws of the United States and that he possesses the willingness and capacity to continue to engage in criminal conduct.  Under these circumstances, only pretrial detention can protect the community from the danger Vallejo poses.

### 3.  History and Characteristics of Vallejo

Vallejo's history and characteristics animate the conclusions drawn from the facts above.  Vallejo, who previously served in the United States Army, used his military training to participate in an attack on our core democratic traditions.  Nothing in his post-January 6

statements or conduct suggest he would refrain from doing it again if he felt his vision of what is necessary was threatened.  In fact, he said so himself on the night of January 6, in the hopes his co-conspirators would join him through the Inauguration.  There is every reason to credit Vallejo's own words and deeds and fear that he would plan additional violence if not detained.

Vallejo's social media posts up to just this week only accentuate that concern.  He continues to threaten to use firearms against authority when he disagrees with that authority, recently messaging that he would "DIE first" before accepting any vaccines related to the ongoing pandemic and "only when I run out of AMMUNITION!"  And, as recently as this week, Vallejo continued to operate as if what he and his co-conspirators did was not unlawful or dangerous, calling the Capitol attack a "peaceful protest" and referring to the 2020 Presidential Election as the "real insurrection."  Vallejo's ongoing willingness and capacity to use firearms on authorities with which he disagrees establishes that no release condition can ensure the safety of the community.

### 4. Vallejo's Danger to the Community and Risk of Flight and Obstruction if Released

Finally, Vallejo is a danger to the community and presents a risk of flight and obstruction of justice.  He participated in a conspiracy to oppose by force the lawful transfer of presidential power and an attack on the United States Capitol in furtherance of this plot.  Moreover, Vallejo supported his co-conspirators' attack on the Capitol by serving as an armed QRF standing ready at a moment's notice to ferry an arsenal of firearms into their hands.  That Vallejo's co-conspirators did not activate him on January 6 does not mitigate his dangerousness.  Vallejo traveled across the country and staged himself near the congressional proceedings ready to transport firearms and equipment into the nation's capital.  That is what makes him a danger.  And there is no evidence that he has renounced violence or that he no longer believes in the necessity of guerilla warfare after January 6 ("We'll be back to 6am to do it again," and retweeting this month, "The real Insurrection happened in the wee hours of January 4, 2020").  That is what makes him a danger *today*.

Similarly, the evidence and seriousness of the charged offenses give Vallejo every incentive to flee and avoid prosecution.  And inherent in his alleged actions is his willingness to obstruct formal proceedings that he opposes, including a presidential election, so there is no reason to believe the defendant will treat his criminal case differently.  His words were deliberate, his deeds were calculated, and his intent was criminal, dangerous, and obstructive.

**IV.   Conclusion**

A grand jury has found probable cause to believe that Vallejo participated in a plot to oppose by force the execution of the laws governing the transfer of presidential power—including an attack on the Congress while it reviewed the election results.  In so doing, Vallejo showed a contempt for the laws and Constitution of this country that make it impossible to trust that he would comply with any conditions fashioned by this Court for his release.  Vallejo must be detained pending trial to protect the safety of the community, ensure his return to court, and safeguard the integrity of the evidence and proceedings in this case.

Respectfully submitted this January 19, 2022.


MATTHEW M. GRAVES
United States Attorney
District of Columbia


By:   Troy A. Edwards, Jr.
Assistant United States Attorney
N.Y. Bar No. 5453741
Ahmed M. Baset
Jeffrey S. Nestler
Kathryn Rakoczy
Assistant United States Attorneys
Louis Manzo
Special Assistant United States Attorney
U.S. Attorney's Office, D.C.
555 4th Street, N.W.
Washington, D.C. 20530

- 20 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

_/s/ Alexandra Hughes_____
Alexandra Hughes
Justin Sher
Trial Attorneys
National Security Division
United States Department of Justice
950 Pennsylvania Avenue
NW Washington, D.C. 20004

**CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrant:

Debbie Jang
Assistant Federal Public Defender

*/s/ Louis Manzo*
U.S. Attorney's Office